**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **PETE HERNANDEZ** | § | |
| | § | |
| **v.** | § | **A-14-CV-492 LY** |
| | § | |
| **THE CITY OF AUSTIN, TEXAS, et al** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT JUDGE

Before the Court are Defendants Alfonso Anderson, Jason Castillo, Peter Dennis, Daniel Doyle, Robert Escamilla, Steven Harris, Jesus Sanchez and John Sikoski's Motion for Summary Judgment (Dkt. No. 41), Plaintiff Pete Hernandez's Response (Dkt. No. 48), and the Defendants' Reply (Dkt. No. 51); and Defendant the City of Austin, Texas's Motion for Summary Judgment (Dkt. No. 42), Hernandez's Responses (Dkt. Nos. 49, 50), and the City's Reply (Dkt. No. 52). A hearing was held on the motions on August 5, 2015, at which the Court ordered the parties to file supplemental briefs. Dkt. No. 55 (Minute Entry). Those supplements are also before the Court (Dkt. Nos. 68, 70). The undersigned submits this Report and Recommendation to the United States District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(h) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

## I.   GENERAL BACKGROUND

This action arises out of the detention of the Plaintiff, Pete Hernandez, by City of Austin police officers who were investigating a report of a stolen vehicle. Hernandez alleges that the Defendants used excessive force causing him injury, in violation of 42 U.S.C. §§ 1983 and 1988,

and the Fourth and Fourteenth Amendments to the Constitution.  He alleges that the City is liable for the officers' actions, as its policies and customs regarding the use of force caused his injuries.  In his responses to the Defendants' Motions for Summary Judgment, Hernandez argues that the City may also be held liable because it later ratified the officers' use of force, which Hernandez argues was "manifestly indefensible," and that it did so after an inadequate investigation.

There are two motions for summary judgment before the Court: the officers have filed one motion for all of them collectively, and the City has filed its own motion.  The officers assert that they are entitled to qualified immunity, and that Hernandez's claims against them are therefore barred.  They argue that any force used was objectively reasonable—that is, not excessive—and in any case not forbidden by clearly established law.  For its part, the City argues that it cannot be held liable as Hernandez has failed to produce evidence that the City's policies were inadequate, it was deliberately indifferent, or that any decision or lack of training or policy was the moving force behind his injuries. Regarding Hernandez's ratification argument, the City argues that this case does not constitute an extreme factual situation where the officer's conduct was "manifestly indefensible." The City's investigation, it contends, was sufficient.

Since the motions were filed, Hernandez has filed with the Court a Notice of Voluntary Dismissal of all claims against Defendants Daniel Doyle, Steven Harris, Jason Castillo and Peter Dennis, which the Court has granted.  Dkt. Nos. 56, 57.  The undersigned therefore will only consider the remaining claims against the City and Defendants Jesus Sanchez, John Sikoski, Alfonso Anderson, and Robert Escamilla, in its evaluation of the motions for summary judgment.

## II.  STANDARD OF REVIEW

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508.  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue.  *Matsushita*, 475 U.S. at 586.  Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment.  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).  Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence.  *Id*.  The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim.  *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## III.  FACTS AND ALLEGATIONS

After a careful review of the record, and drawing all inferences in favor of the non-moving party, Hernandez, the basic facts of the case are as follows.  On June 7, 2012, Pete Hernandez left a Walmart store through the main entrance, and walked across the "roadway" portion of the parking lot immediately adjacent to the front door.  Dkt. No. 48-3 at 1.  Parked in the closest parking spot across from the entrance, on the opposite side of the drive in front of the store, was an SUV. Hernandez's path took him across the drive, immediately past the front end of the SUV, where he then turned to his right and proceeded along the passenger side before turning to his left, away from the vehicle.  Dkt.  No.  41-1 (Attached Video from Dashboard Camera of Sgt. Sikoski) at 13:25:24 *et seq.* and Dkt. No. 41-4 (Attached Video from Dashboard Camera of Officer Escamilla) at 13:25:22 *et seq.*  As he made his turn away from the vehicle, police officers standing behind and to the right of the SUV began to yell at him to "get on the ground."  Dkt. No. 48-3 at 2. Hernandez then either stopped moving entirely or took a step to the side.  Dkt. No. 48-1 at 5.  As this happened, Officer Jesus Sanchez ran to Hernandez, left his feet, and tackled Hernandez "heads up"—that is, chest to

4

chest.  Dkt.  No.  41-4 (Escamilla Video) at 13:25:30 *et seq*.  Once Hernandez was on the ground, Officer Sanchez began to place him in handcuffs.  *Id*.  As he did so, Hernandez's left hand was laying flat on the ground out above his head.  Dkt. No. 41-1 (Sikoski Video) at 13:25:44 *et seq*.  Officer Robert Escamilla put his foot on Hernandez's hand.  *Id*.  Once Hernandez was fully handcuffed, he was loaded into the back of Officer Escamilla's police cruiser.  Dkt. No. 41-4 (Escamilla Video) at 13:25:58 *et seq*.  No one put a seatbelt on Hernandez, and he was not secured in any way.  *Id*.  With Hernandez in the back, Officer Escamilla drove his police cruiser at up to 37 miles per hour around to the other side of the Walmart.  *Id*.  After speaking with other officers there, Officer Escamilla checked in on Hernandez, who stated that he was in pain and that he was having a panic attack.  Dkt.  No.  45-1 at 6.  Officer Escamilla then drove Hernandez back to the front of the Walmart where, after conferring with other officers, he released Hernandez from custody.  *Id*.  Officer Escamilla told Hernandez that he could speak with a supervisor if he had any complaints.  Dkt. No. 41-4 (Escamilla Video) at 13:36:40 *et seq*.  Hernandez did so, talking with an unknown supervising officer.  *Id*.  The officers then called an ambulance and Hernandez was taken to a hospital.  Dkt. No. 45-1 at 6.

Hernandez, it turns out, had walked right into the middle of a crime scene.  Austin Police Department Officers were investigating a report of a stolen vehicle.  Dkt. No. 45-1 at 5.  When Hernandez arrived, several police cruisers had converged on the vehicle, a black GMC Yukon, which was parked near the front of the Walmart.  A woman was in the driver's seat, and the passenger seat was empty.  *Id*.  Officer Escamilla, who had parked his police cruiser behind the Yukon, was about to approach the vehicle to detain or arrest the occupant.  *Id*.  Sgt. Sikoski then arrived in the front of the parking lot and stopped on the curb near the Walmart entrance.  Surveying the scene, Sgt.

Sikoski surmised that the woman was waiting for someone to return from the store.  Dkt. No. 41-1 at 5.  Sgt. Sikoski saw Hernandez exit the Walmart and walk toward the Yukon.  *Id*.  As Hernandez got closer to the Yukon, Sgt. Sikoski formed the belief that Hernandez was a second suspect, and said into his radio, "grab that dude," "grab that dude," and "grab him," with increasing levels of urgency in his tone.  Dkt. No. 41-1 (Sikoski Video) at 13:25:34 *et. seq.*  Officers Escamilla and Sanchez immediately yelled at Hernandez to "stay" and "get on the ground" several times.  Dkt. No. 45-1 at 5.  While still yelling "get on the ground," Officer Sanchez ran at Hernandez and tackled him.  Dkt. No. 41-3 at 5, and Dkt. No. 41-4 (Escamilla Video) at 13:25:30 *et. seq.*  The total time  elapsed from the first time an officer gave Hernandez a command ("Stay!") until the time that Officer Sanchez impacted Hernandez was less than 4 seconds.  *Id.* at 13:25:36-37 to 13:25:40.  The initial command by Sgt. Sikoski to "Grab that dude!" came approximately one second before the first order was given to Hernandez.  *Id.* at 13:25:35.  It appears clear that prior to being yelled at by the officers, Hernandez was oblivious to the fact that numerous officers were approaching the Yukon, or that he was in the middle of an unfolding police action.  Meanwhile, Officer Anderson opened the door of the Yukon, removed the woman from the drivers' seat and placed her into custody.  Dkt. No. 41-2 at 3.  When asked if she knew Hernandez, the woman repeatedly said that she did not know who Hernandez was.  Dkt. No. 41-1 (Sikoski Video) at 13:26:27, *et seq.*  The officers then located and detained another suspect, who turned out to be the man they were after.  *Id.* at 6.  Once that suspect was in custody, Officer Escamilla released Hernandez.  Dkt. No. 45-1 at 6.

Subsequently, Hernandez filed a complaint with the Office of the Police Monitor.  Dkt. No. 68-1 at 8.  Hernandez attached an affidavit in which he described the incident, and made three complaints:

1.   The officers should of investigated more before falsly accusing me with physical abuse.
2.   I was so humiliated when I was on the ground being looked upon by the community, as if I were a criminal, when I was an innocent person.
3.   You see this on t.v. but you would never think this could happen to you, thank god was looking after me.

Dkt. No. 68-1 at 11 (*sic*).  In response to his complaint, the City conducted an investigation.  It reviewed the police report, Hernandez's affidavit, the Computer-Aided Dispatch Incident Detail Report, and the video recordings from each officer's vehicle.  *Id*. at 2.  Ultimately, the City found "no violations of Departmental Policy" and determined that "no further investigation will occur." *Id*. at 1.  However, "while no policy violations were noted and the force used was objectively reasonable," the City "noted several areas of concern that will be addressed through training." *Id*. at 3.  Specifically, the City stated that "while transporting prisoners in the backseat of a patrol vehicle," as Officer Escamilla did with Hernandez, "they need to be seat belted at all times." *Id*. at 4.  Further, "Officer Escamilla should not have driven his police unit through the parking lot to assist another unit while he had a prisoner in his back seat" when other police units were available to complete this task.  *Id*.   Officer Escamilla "should have done a better job explaining the circumstances to the subject," and "should have maintained closer observation of [Hernandez] until the medics could evaluate the subject's medical status." *Id*.  Still, as noted, the City did not find any policy violations.

## IV.  ANALYSIS

Hernandez has alleged that Officers Anderson, Escamilla, Sanchez and Sikoski used excessive force or failed to stop their fellow officers' use of excessive force.  By their motion for summary judgment, the officers argue that any force used was not excessive, and that they are

entitled to qualified immunity.  Hernandez has also alleged that the City of Austin is liable for his injuries because its policies and procedures regarding excessive force were insufficient, and, alternatively, because it ratified the officers' actions.  The City has also filed a motion for summary judgment, arguing that its policies and procedures are sufficient and that the circumstances here do not constitute a ratification of the officers' action.

A.      **Whether the force used was excessive**

Fifth Circuit precedent recognizes a cause of action under the Fourth Amendment for the use of excessive force while effectuating an arrest, investigatory stop, or other seizure. *Spann v. Rainey*, 987 F.2d 1110, 1115 (5th Cir. 1993) (citing *Graham v. Connor*, 490 U.S. 386 (1989)). In order to state a claim for excessive force in violation of the Constitution, the plaintiff must allege "(1) an injury,  (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012). An arrest or seizure necessarily entails "the right to use some degree of physical coercion . . . to effect it," however, the amount of force used must be objectively reasonable—that is, proportional to the need for that force. *Graham*, 490 U.S. at 396.  Objective reasonableness is a balancing test that compares the amount of force used to the amount of force needed in the particular situation.  *Id*.  Thus, the "facts and circumstances of the particular case" determine the amount of force that is constitutionally permissible.  *Id*.  If the amount of force used is clearly beyond what is necessary to effectuate the arrest, investigatory stop, or seizure, then the amount of force is excessive and constitutionally infirm.  In determining the amount of force needed in a particular situation, courts consider a variety of factors, commonly called the *Graham* factors, which include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. Moreover, reasonableness is to be judged from the perspective of "a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. Officers are frequently placed into "tense, uncertain, and rapidly evolving" circumstances, and reasonableness must account for "the fact that police officers are often forced to make split-second decisions." *Id.* at 397.

There is no issue of material fact regarding Hernandez's claims against Officer Anderson. The video evidence attached to the officers' motion for summary judgment makes it clear that Officer Anderson had nothing to do with the detention of Hernandez. Rather, he was at all relevant times engaged in securing the stolen vehicle and detaining the female suspect inside. *See, e.g.,* Dkt. No. 41-4 (Escamilla Video) at 13:25:30 *et seq*. It also makes it clear that even if Officer Anderson considered the actions of his fellow officers to be excessive, the speed with which the events occurred made it impossible for him to stop them. As such, all claims against Officer Anderson should be dismissed.

The same cannot be said for Officers Sikoski, Sanchez, and Escamilla. A review of the evidence in the record reveals genuine issues of material fact regarding whether these officers' conduct was excessive. Each of these officers was directly involved in the application of force to Hernandez: Sikoski ordered his fellow officers to "grab" Hernandez;[1] Sanchez tackled Hernandez;

---

[1] The fact that Sgt. Sikoski did not himself apply any force to Hernandez does not absolve him from liability. A supervisory official may be held liable under § 1983 for excessive force if he affirmatively participates in acts causing the use of force. *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). To establish such liability, a plaintiff must show that the supervisor "act[ed], or fail[ed] to act, with deliberate indifference to violations of others' constitutional rights committed by the[ ] subordinates." *Id.* Here, Sgt. Sikoski made the determination to detain Hernandez, and ordered his subordinates to "grab" him, thereby affirmatively participating in the use of force on Hernandez. Further, he did so on very little evidence, knowing that force was likely to be used, which a jury could determine amounts to deliberate indifference to the effect of his order on Hernandez's rights.

Escamilla stepped on his hand.  Yet it is not clear from the record why the officers believed that using any force on Hernandez was necessary.  First, there is a fact question as to whether the officers' determination that Hernandez was a suspect was objectively reasonable.  The only person who addressed this issue is Sgt. Sikoski, who gave the order to "grab" Hernandez.  He testified that it appeared to him that the female driver of the Yukon was waiting for someone, and he then had a hunch that Hernandez was the person she was waiting for when he saw Hernandez walk toward the Yukon.  Whether these facts were enough to determine that Hernandez was a suspect in the auto theft is questionable.  And whether Sgt. Sikoski's "hunch" was enough to support anything more than simply approaching Hernandez to question him is even less certain.

Further, even if it is assumed that officers reasonably viewed Hernandez as a suspect, rather than only a "person of interest," there is nothing in the record indicating that the crime at issue was sufficiently severe to justify tackling or stepping on Hernandez.  While the officers knew that a vehicle had been stolen, nothing in the record indicates that they were given any information about the suspects (or even if there was more than one suspect), or that the suspect(s) was armed or potentially violent.[2]  There is also no evidence the officers believed Hernandez posed an immediate threat to their safety.  And while Officer Sanchez has stated that he was worried about the safety of "a parking lot full [of] a lot of innocent people," there is no evidence that Hernadez had a weapon, was behaving erratically, or was menacing, or that the officers had any reason to believe he was or would be dangerous to anyone.  Dkt. No. 70-2 at 10.  Indeed, Officer Sanchez stated that at the time

---

[2]The only evidence in the record on this point appears to suggest that the perpetrators used a forged check to obtain the vehicle, but there is no evidence that this information was known to the officers when they detained Hernandez.  Dkt. No. 49-3 at 6 (CAD Call Hardcopy, stating that several blank checks and forms of identification for multiple individuals were found in the vehicle after both Hernandez and the suspects were detained).

he decided to tackle Hernadez he had no reason to believe Hernandez was armed, and did not know what his intentions were.  *Id*.  The videos reflect that Hernandez was holding a McDonald's bag in one hand, and that his other hand was empty.  Dkt. No. 41-4 (Escamilla Video) at 13:25:30 *et. seq*. And Sgt. Sikoski confirmed in his deposition that while he had a "hunch" or "assumption" that a person suspected of committing felony theft might be dangerous or armed, no one had told him anything that would substantiate that assumption, and nothing he saw at the scene supported that hunch.  Dkt. No. 68-2 at 2.  Sgt. Sikoski also confirmed that he did not instruct his fellow officers to detain Hernandez because he appeared to be a threat, or because he was fleeing.  Dkt. No. 70-1 at 8-9.

There is also conflicting testimony regarding whether Hernandez was doing anything that could reasonably be viewed as an attempt to flee.  Officer Sanchez stated that he tackled Hernandez because Hernandez did not comply with the officers' orders that he get on the ground.  Dkt. No. 70-2 at 7.  The decision to stop Hernandez, he said, came in response to Sgt. Sikoski's order to "grab him," which Sanchez interpreted to mean "detain him."  Dkt. No. 70-2 at 7.  Hernandez has testified that when he heard the officers, he either stopped moving completely, or took a step back towards the vehicle.  Officer Sanchez, on the other hand, has stated that Hernandez turned away from the vehicle and looked as though he was about to flee the area.  Dkt. Nos. 68-7 at 1, Dkt. No. 70-2 at 169. Officer Escamilla stated that while it "appeared that [Hernandez] was going to attempt to evade us," after the officers yelled at him to "get on the ground," Hernandez "slowly began to comply" before he was tackled by Officer Sanchez.  Dkt. No. 41-4 at 5.  The video evidence does not clearly capture Officer Sanchez tackling Hernandez, as every camera available has its view obstructed.  But the time that lapsed from when Escamilla and Sanchez ordered Hernandez to "get on the ground,"

11

until the time Hernandez was tackled—less than 4 seconds—contradicts Sanchez's claim that he tackled Hernandez because Hernandez was not complying with orders, as Hernandez never had time to comply, and Sanchez started running toward Hernandez while he was still giving Hernandez the command. Whether or not Hernandez began to flee, or even indicated that he was going to flee, is a fact material to the Court's evaluation of the officers' actions, most especially Officer Sanchez's decision to tackle, rather than merely approach, Hernandez.  Given the fact dispute, summary judgment is not appropriate.

Finally, there are glaring inconsistencies between the video evidence and the officers' affidavits.  For example, Sgt. Sikoski stated in his affidavit submitted with his summary judgment motion that he "got out of [his] patrol unit" and saw Hernandez "walk around the front of the Yukon and then stand near the passenger's side front door of the Yukon.  I made eye contact with this individual, and he immediately turned and began to walk away." Dkt.  No.  41-1 at 5.  He then "instructed the other Austin police officers at the scene to detain this individual." *Id*.  Each of these assertions is contradicted by the videos.  The videos make it abundantly clear that Sgt. Sikoski was still in his vehicle when he told his subordinate officers to "grab" Hernandez, that Hernandez never turned to face Sgt. Sikoski so as to look him in the eye, and that Hernandez did not pause at the passenger-side door.  Dkt. No. 41-1 (Sikoski Video) at 13:25:24 *et seq.,* and  Dkt. No. 41-4 (Escamilla Video) at 13:25:22 *et seq.*  Indeed, the video shows no suspicious activity, only a man walking out of a Walmart with a McDonald's bag, crossing the street, and navigating between vehicles in a crowded parking lot. Dkt. No. 41-1 (Sikoski Video) at 13:25:19 *et. seq.*  Further, the video does not corroborate Sanchez's claim that Henrandez was "about" to run, or that he made moves consistent with an intent to flee.  Instead, what is visible on the video is a person who is

walking through a parking lot to his car suddenly finding himself surrounded by police screaming at him, and then responding as one would expect him to respond—with shock and confusion.  Given all of the factual disputes on issues material to determining whether the force used was commensurate with the circumstances, summary judgment is unwarranted as to Officers Sikoski, Sanchez and Escamilla.

### B.      Whether the defendants are entitled to qualified immunity

The doctrine of qualified immunity affords state actors protection against liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Immunity in this sense means immunity from suit, not merely from liability.  *Jackson v. City of Beaumont Police Dep't*, 958 F.2d 616, 618 n.3 (5th Cir. 1992).  Moreover, "[q]ualified immunity is designed to shield from civil liability all but the plainly incompetent or those who violate the law."  *Brady v. Fort Bend Cnty.*, 58 F.3d 173, 174 (5th Cir. 1995).  Because the immunity is an immunity from suit, courts treat it as a threshold question that should be decided "at the earliest possible stage in the litigation."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

Nonetheless, while qualified immunity is a question of law, the analysis is informed by the facts.  Thus, when there are genuine issues of material fact regarding the circumstances of the use of force, a granting of summary judgment on the qualified immunity issue is inappropriate.  Accordingly, the genuine issues of material fact regarding these officers' use of force render inappropriate a grant of summary judgment on the officer's qualified immunity defense in this case.

**C.       Whether the City of Austin's policies or procedures cause it to be liable**

Hernandez alleges that the City is liable for his injuries because the officers' use of excessive force was the direct result of the City's policies and customs.  Hernandez brings what is colloquially referred to as a "failure to train or supervise claim." In 1978 the Supreme Court in *Monell v. Department of Social Services of City of New York* held that municipalities can be sued directly under §1983 for constitutional deprivations when municipal policy is the moving force behind a plaintiff's injury. 436 U.S. 658, 694 (1978).  The *Monell* holding overruled the longstanding *Monroe v. Pape* ruling that immunized municipalities from suit under §1983.  *Monell* allows municipal liability specifically when a (1) "policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy" violates the constitution, and (2) when a "governmental 'custom' even though such custom has not received formal approval through the government's official decision-making channels," violates the constitution.  *Id.* at 690-692.  Accordingly, municipalities can be subjected to liability only when their official policies or customs are unconstitutional.  *Id.*  The *Monell* Court warned that the new holding is not an application of *respondeat superior* within government agencies, and it should not be "easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor" *Id.* at 692.  Instead, a municipality is only liable for its employees' actions when they are executing official municipal policy or custom that causes injury.  *Id.* at 690-692.

The Fifth Circuit in *Valles v. City of Houston* created a three prong test to determine when a city is liable under the *Monell* line of cases as a result of a failure to train. A plaintiff must show that (1) the municipality's training policy or procedure was inadequate, (2) the inadequate training

policy was a "moving force" or cause of the plaintiff's constitutional deprivation, and (3) the

municipality was deliberately indifferent to the need to adjust its training policy or adopt a new one.

*Valles v. City of Houston,* 613 F.3d 536, 544 (5th Cir. 2010).   Additionally, the "plaintiff must

allege with specificity how a particular training program is defective. *Roberts v. City of Shreveport*,

397 F.3d 287 (5th Cir. 2005).

As evidence that the City's training and policies were inadequate, Hernandez points to two

letters written by the Department of Justice to the City in 2008 and 2011.   Dkt. Nos.   68-5, 68-6.

Although the letters contain observations and recommendations that the City should revise certain

aspects of its use of force policy, they do not show that the City's training policies were inadequate.

Indeed, one of the letters stated that the Department of Justice did "not find reasonable cause to

believe that APD has engaged in a pattern or practice that violated the Constitution or laws of the

United States," that the City had implemented earlier recommendations for policy reforms, and that

therefore the Department of Justice was "clos[ing] our investigation."   Dkt. No. 68-5 at 1.

Additionally, Hernandez fails to provide any evidence that an unconstitutional City policy was the

moving force behind his injuries.   The moving force element requires more than a "coupling between

cause and effect." *Valles*, 613 F.3d at 546.   It requires that a plaintiff show that a deficiency in

training was the actual cause of a constitutional violation. *Id*.   This Hernandez has not done.

Furthermore, Hernandez has not shown that the City was deliberately indifferent to its

officers' need for more or different training.   The Fifth Circuit has held this element is demonstrated

only when "the need for more or different training is so obvious, and the inadequacy so likely to

result in the violation of constitutional rights, that the policymakers of the city can reasonably be said

to have been deliberately indifferent to the need." *Canton v. Copeland*, 577 Fed.Appx. 355, 390 (5th

Cir. 2014).   Deliberate indifference, then, is more than negligence or even gross negligence; "[u]sually, a plaintiff must show a pattern of similar violations, and in the case of an excessive force claim . . . the prior act must have involved injury to a third party."   *Valles,* 613 F.3d at 548. Hernandez does not provide evidence of a pattern of similar violations, nor does he substantiate the claim that the City was deliberately indifferent to the need for more or different training.   Overall, Hernandez has failed to raise any issue of material fact regarding the City's training or policies.   As such, summary judgment on this claim is warranted.

### D.       Whether the City of Austin ratified the officers' actions

In response to the City's motion for summary judgment, Hernandez added another theory of recovery: he alleges that the City is liable because it ratified its officers' use of excessive force by approving their actions in its post-incident investigation.   Dkt. No. 51 at 1.   The municipal post-ratification theory of recovery is derived from *City of St. Louis v. Praprotnik,* a Supreme Court suit wherein a plurality found that: "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."   485 U.S. 112, 127 (1988).   Stated differently, if a subordinate municipal employee commits a constitutional violation and a delegated policymaker then approves that violation, the policymaker has ratified the subordinate's conduct thereby making it official policy that can be chargeable to the municipality.   *Id.*   To succeed on a ratification theory of recovery, a plaintiff must show that the investigation found constitutional violations that the policymaker then knowingly approved.   *Coon v. Ledbetter*, 780 F.2d 1158, 1162 (5th Cir. 1986).   Here, the City completed a thorough investigation of the officers' conduct and found no violations.   As such, it cannot be said to have ratified unconstitutional conduct of which it had actual or constructive knowledge.

16

However, even if a policymaker is unaware that an officer's conduct was unconstitutional, it may still be held liable if its subordinate's conduct is manifestly indefensible. *Ledbetter*, 780 F.2d at 1162. The threshold of what constitutes manifestly indefensible conduct is extraordinarily high. For instance, in *James v. Harris County*, the court dismissed a municipality from a suit where an officer shot a suspect in the back during a traffic stop, finding the officer's version of the events did not describe a situation which was "manifestly indefensible." *James v. Harris County*, 508 F.Supp.2d 535, 539 (S.D. Tex. 2007). The seminal "manifestly indefensible" fact pattern comes from *Grandstaff v. City of Borger*, 767 F.2d 161, 165 (5th Cir. 1985). In that case, a group of sheriff's deputies was engaged in a high speed pursuit of a suspect, and followed him off the highway and onto another man's ranch. *Grandstaff v. City of Borger.* 767 F.2d at 165. Upon arriving at the ranch the deputies reached the suspect and injured him by firing at him. *Id.* Although injured, he continued to flee. *Id.* When the ranch foreman heard the commotion, he left his home and drove his truck down towards the police officers to investigate. *Id.* When he realized what was going on, he returned home, told his family to stay inside, and drove his truck back towards the officers, intending to help. *Id.* When he drove by the deputies they opened fire on him and killed him. *Id.* After an internal investigation, the sheriff's department found that the deputies had followed all departmental procedures. *Id.* The jury found that the City's approval of the officers' conduct demonstrated the existence of an unconstitutional policy, and therefore that an unconstitutional policy was the cause of the incident. *Id.* at 171. The court reasoned: "[The Policymaker's] reaction to so gross an abuse of the use of deadly weapons says more about the existing disposition of the City's policymaker than would a dozen incidents where individual officers employed excessive force." *Id.*

17

In a recent case in the Southern District of Texas, the court also found an officer's conduct was manifestly indefensible, and therefore denied a city's motion for summary judgment. *Hobart v. City of Stafford*, 916 F.Supp.2d 783, 797 (S.D. Tex. 2013).  The victim in that suit, a 19 year old schizophrenic, was shot and killed when his mother called police asking for assistance to control her son.  *Id.* at 785-791.  She was worried because he was being especially belligerent.  *Id.*  The mother told police that her son did not have weapons in the room, nor was he under the influence.  *Id.*  The officer who answered the call testified that upon entering the house, he ascended stairs to the victim's bedroom, whereby he fell unconscious when the victim charged and struck his head and arms.  *Id.*  The officer shot the victim four times until dead.  *Id.*  The department conducted an internal investigation and found the officer's conduct in conformance with departmental policy. *Id.*  The court found that a jury could conclude that "firing a weapon, while apparently losing consciousness, in response to being struck by a mentally ill individual who was known to be unarmed, without any awareness of where innocent bystanders were positioned" is manifestly indefensible conduct.  *Id.* at 797.

Hernandez contends that the officers' conduct here was manifestly indefensible.  The Court cannot agree.  The officers' actions are not as objectively egregious as the officers' actions in *Grandstaff*, or even *Hobart*: there is neither death, use of deadly force, nor even severe injury.  While a jury may conclude that the treatment of Hernandez amounts to an excessive use of force, the force used is not even close to the sort of reckless indifference towards human life seen *Grandstaff* and *Hobart*.

While unclear, Hernandez also appears to argue that the City's investigation of the incident was so insufficient that it amounted to little more than a "rubber stamp" of the officers' behavior.

18

In effect, Hernandez argues that the investigation itself was the manifestly indefensible conduct for which the City should be held liable. The *Hobart* Court introduced this alternative ratification theory when it held that:

> Policymakers who simply go along with a subordinate's decision do not thereby vest final policymaking authority in the subordinate, nor does a mere failure to investigate the basis of as [*sic*] subordinate's discretionary decisions amount to such a delegation. . . . However, once a policymaker does initiate an investigation, surely this Court must be entitled to consider whether that investigation was merely a rubberstamping process.

*Id.* at 798 (internal citations and quotations omitted). Accordingly, in *Hobart*, the court held that "a reasonable jury could find the City liable on a ratification theory," reasoning there were "indications in the record that [the Policymaker] did not consider it his role to evaluate the reasonableness of [the Officer's] assessment of the threat level." *Id.* at 798. Among other things, the policymaker there did not even discuss the incident with the offending officer. *Id.* at 797. By contrast, the City's investigation of the Hernandez incident was thorough: It reviewed the police report, Hernandez's affidavit, the Computer-Aided Dispatch Incident Detail Report, and the video recordings from each officer's vehicle. Dkt. No. 68-1 at 2. Indeed, the City actually criticized Officer Escamilla's treatment of Hernandez from the time he was placed in the vehicle. The Court cannot agree that there is any fact question regarding whether this investigation was "manifestly indefensible." Accordingly, the Court should reject Hernandez's ratification arguments and dismiss all claims against the City.

## V.  RECOMMENDATION

Based upon the foregoing, the undersigned Magistrate Judge **RECOMMENDS** that the individual Defendants' Motion for Summary Judgment (Dkt. No. 41) be **DENIED** as to the claims

against Jesus Sanchez, John Sikoski, and Robert Escamilla, but **GRANTED** as to all claims against Alfonso Anderson, and that the Court enter judgment in Anderson's favor on all of Plaintiff's claims against him.  The Magistrate Judge further **RECOMMENDS** that the District Court **GRANT** the City of Austin's Motion for Summary Judgment (Dkt. No. 42), and enter judgment in the City's favor on all of Plaintiff's claims against the City.

## V.  WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985);  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 17th day of November, 2015.


ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE